IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

IVY MELENDEZ-ARROYO,

    Plaintiff

v.                               CIVIL NO. 98-2395 (JP)

CUTLER HAMMER DE PUERTO RICO CO.,

    Defendant

## OPINION AND ORDER

### I. INTRODUCTION AND BACKGROUND

The Court has before it Defendant's Motion for Summary Judgment **(docket No. 98)**, Plaintiff's Opposition to Motion for Summary Judgment (docket No. 107) and Defendant's Reply to Opposition for Motion for Summary Judgment (docket No. 115). Plaintiff Ivy Meléndez-Arroyo ("Meléndez") filed her original Complaint on December 14, 1998. Thereafter, on April 28, 1999, Plaintiff amended her Complaint alleging that she was discriminated against by her employer Defendant Cutler Hammer De Puerto Rico ("Cutler Hammer") on account of her age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634 ("ADEA") and Puerto Rico Law 100 of June 30, 1959, as amended, 29 L.P.R.A. §§ 146-152 ("Law 100"), as well as unjust dismissal pursuant to Law 80, 29 L.P.R.A. §§ 185a-185m. She further asserted claims arising out of the alleged violation of her constitutional right to privacy and dignity under the Constitution of the Commonwealth of Puerto Rico and Article 1802

AO 72A
(Rev.8/82)

CIVIL NO. 98-2395 (JP)

and 1803 of the Civil Code of Puerto Rico. Meléndez seeks declaratory relief and front and back pay in lieu of reinstatement, as well as monetary damages. Plaintiff alleges that Defendant's discriminatory actions made her workplace so unbearable that she was forced to resign. Defendant Cutler Hammer contends that Meléndez was not discriminated against in her employment, and that this Court should grant summary judgment in its favor because Plaintiff fails to present a prima facie case under the ADEA. Defendant contends that Plaintiff failed to show (1) that she met Defendant's legitimate job performance expectations and (2) that Defendant committed any adverse employment action against her. Further, Defendant moves this Court to grant summary judgment dismissing all claims against it by arguing that (1) it had legitimate non-discriminatory reasons for Plaintiff's transfer within the company which were not based on Plaintiff's age and (2) Plaintiff lacks sufficient evidence to establish that Defendant's decision to transfer her was based on age.

A brief history of the proceedings in this case is now in order. On June 18, 1999, the Court held an Initial Scheduling Conference ("ISC") in which both parties were present. Because Defendant argued that the action should be dismissed on account of untimeliness, the Court ordered both parties to submit motions on the matter. By Order dated March 3, 2000, the Court denied Defendant Cutler Hammer's request for summary judgment because it found that (1) there were

CIVIL NO. 98-2395 (JP)

genuine issues of material fact pertaining to the accrual date of the period of limitations for Plaintiff's ADEA claim, and (2) there were issues of fact regarding Plaintiff's mental condition after her demotion (docket No. 68).

The Court then held a Further Scheduling Conference on April 13, 2000. At the Further Scheduling Conference, the Court set trial for November 30, 2000, the pre-trial conference for November 17, 2000, and allowed until September 20, 2000 for the filing of dispositive motions.

In furtherance of effective pre-trial management, the Court excluded the testimony of Don Gardner, Jorge Betancourt and John Semanchik, three of Defendant's witnesses, because Defendant did not notify these witnesses within the time-frame set forth by this Court's Initial Scheduling Conference Order ("ISC").[1] Moreover,

---

[1] All attorneys practicing before this Court are expected to be well versed in pre-trial practice. They are encouraged to read Judicial Economy and Efficiency Through the Initial Scheduling Conference: The Method, 35 Cath. U. L. Rev. 943 (1986) authored by the undersigned Judge. They are also encouraged to peruse the Civil Justice Reform Act, codified at 28 U.S.C.A. §§ 471-482 (West 1993) in order to understand the necessity of adhering to orders concerning pre-trial discovery. The federal docket is replete with costly time consuming litigation. The importance of this Court's ISC and its resulting Order is to streamline this litigation and reduce the cost and delay that so frequently characterizes it. Defendant Cutler Hammer's non-compliance with the ISC Order's deadline to announce additional witnesses in the instant case flew in the face of this Court's pre-trial procedure, and upset its case management system. Rule 37 of the Federal Rules of Civil Procedure provides that if a court enters an order compelling discovery but a party does not comply with it, the court may prohibit that party from introducing designated matters into evidence. Fed. R. Civ. P. 37(b)(2); see also, United States Federal & Guaranty Co. v. Baker Material Handling Corp., 62 F.3d 24, 29 (1st Cir. 1995). Accordingly,

3

CIVIL NO. 98-2395 (JP)

Defendant failed on numerous occasions to demonstrate to the Court's satisfaction why it was not able to comply with the ISC deadline for announcing these witnesses.

Following the submission of Defendant's motion for summary judgment (docket No. 98) and Plaintiff's opposition thereto (docket No. 107), Defendant moved for leave to reply to Plaintiff's opposition, and requested that oral arguments be held on the instant summary judgment motions. The Court granted the same and held oral arguments on November 13, 2000. During the oral arguments, the Court **ORDERED** Cutler Hammer to produce its Company employees as witnesses in the event of trial.

II. **UNCONTESTED FACTS**

Based on the record and the parties' contentions, and after having completed discovery in the instant matter, the Court finds the following facts to be undisputed:

A. **Plaintiff's Employment History with Defendant**

1. Plaintiff Ivy Meléndez Arroyo was born on January 14, 1941 and is a resident of the municipality of Bayamon, Puerto Rico.

2. Plaintiff started working for Westinghouse in 1968.

3. In 1984, Plaintiff was the Controller of the Aguas Buenas Plant of Westinghouse.

---

this Court prohibited Defendant Cutler Hammer from introducing the testimony of Don Gardner, Jorge Betancourt and John Semanchik.

4

CIVIL NO. 98-2395 (JP)

4. In October 1984, Westinghouse centralized its accounting operation for Puerto Rico. As a result thereof, Plaintiff was transferred to the Accounting Manager position to work under the leadership of Larry Cancel in the Toa Baja plant.

5. Larry Cancel directly supervised Plaintiff in the Accounting Manager position until 1989. He then supervised Plaintiff from 1993 to 1997.

6. Plaintiff attended a full day seminar on Labor Law conducted by attorney Ruy Delgado Zayas on October 24, 1993.

7. On January 31, 1994, while Plaintiff was employed with Westinghouse, Eaton Corporation through Cutler Hammer de Puerto Rico, Inc., acquired all of Westinghouse's businesses in Puerto Rico. Cutler Hammer bought Westinghouse and became the successor employer for the Westinghouse employees.

8. Defendant functions is an employer engaged in interstate commerce, employing more than 500 people in each calendar week in the current and preceding calendar year.

9. Beginning in 1994, Eaton Corporation through Cutler Hammer began to incorporate new accounting programs and to implement a new way of administering the business.

10. Different from its predecessor, Westinghouse, Eaton evaluates business beginning with the manufacturing process up to the product's final destiny, which is the continental United States. The new accounting process requires a more complex financial process and requires that additional reports be made.

11. Plaintiff continued to render accounting services for the Cutler Hammer, as she did for its predecessor, Westinghouse.

12. During Plaintiff's thirty-year tenure with the company, she occupied the following positions: Accounting Detail Clerk, Accounts Payable Accountant, General Accountant, Cost Accountant, Chief

5

CIVIL NO. 98-2395 (JP)

Accountant, Comptroller, Accounting Manager, and Finance Reporting Administrator, and during said period, Plaintiff was promoted on no less than six (6) occasions.

13. Neither Defendant nor its predecessor reduced Plaintiff's salary, benefits or total compensation.

14. On February 14, 1997, Larry Cancel and the Human Resources Manager, Luis Pizarro met with Plaintiff and informed her that she would no longer hold the Accounting Manager position at Cutler Hammer. They informed her that she would occupy a position in Financial Reporting within the same company.

15. Cutler Hammer's discrimination and equal employment policies are established in its employee manual. Westinghouse's employee manual was in effect until January 1997.

16. In February 1997, the new Cutler Hammer Manual was adopted and given to its employees.

17. On February 8, 1997, Defendant gave plaintiff a new employee manual, six days prior to her transfer to the Finance Reporting Administrator position. On even date, a full-day seminar on Eaton's policies was held at the Condado Plaza Hotel for all managerial employees. Employee manuals were given to all managerial employees. Plaintiff received Defendant's old and new employee manuals.

18. Plaintiff did not read the employee manuals that she received from Defendant.

19. On February 14, 1997, Plaintiff's position was changed to one in Finance Reporting and her salary was increased.

20. Plaintiff's salary increase was characterized as a "merit increase" in a company document.

21. Robert Irizarry, a male who is younger than Plaintiff replaced Plaintiff in the position of Accounting Manager at Cutler Hammer on March 17, 1997.

6

AO 72A
(Rev.8/82)

CIVIL NO. 98-2395 (JP)

22. After becoming Finance Reporting Administrator, Plaintiff was absent from work on several occasions; from February 14, 1997 to February 26, 1997 and from March 26, 1997 to May 12, 1997.

23. Plaintiff went to the Anti-discrimination Unit ("ADU") of the Puerto Rico Department of Labor to file an age discrimination charge against the Defendant more than one year after her transfer to Financial Reporting Administrator.

24. Pursuant to the copy of the charge of discrimination with the ADU, Plaintiff swore to her charge of discrimination on February 16, 1998. The filing stamp of the ADU is dated March 4, 1998.

25. On August 16, 1998, the Social Security Administration determined that Plaintiff was disabled, and that she had been disabled since November 6, 1997. Plaintiff was granted benefits upon application without having to go before an Administrative Law Judge.

26. On August 16, 1998, the Social Security Administration determined that Plaintiff was entitled to receive monthly Social Security benefits starting in May 1998.

27. The new Finance Report position to which Plaintiff was assigned was created by the company exclusively for her. The position was subsequently eliminated after Plaintiff left the company.

Further, since Plaintiff has not produced evidence to the contrary, the Court also finds the following four facts concerning Plaintiff's work history to be undisputed:

28. Plaintiff's performance as Accounting Manager at Cutler Hammer was unsatisfactory to her superiors.

29. Plaintiff was behind in her work responsibilities as Accounting Manager.

AO 72A
(Rev.8/82)

CIVIL NO. 98-2395 (JP)

30. Plaintiff exhibited poor communication skills when dealing with issues related to her job as Accounting Manager.

31. Plaintiff gossiped at work.

B. **Plaintiff's Medical History**

32. Dr. Raul Nunez has been Plaintiff's treating physician since March 11, 1997 to present.

33. On March 11, 1997, during Plaintiff's first visit to Dr. Nunez, Dr. Nunez diagnosed Plaintiff with an adjustment and mixed mood disorder and prescribed medication. Dr. Nunez's notes state that Plaintiff had a history of mental illness and was using medications prescribed by Dr. Franceschini. Plaintiff stated that she felt that she was being discriminated against and threatened by her boss.

34. On March 26, 1997, Plaintiff visited Dr. Nunez for a second time. Dr. Nunez's notes state that Plaintiff presented a clinical picture much more intense and compatible with major depression. Dr. Nunez recommended three weeks rest for Plaintiff and issued a medical certificate attesting to these observations.

35. On April 1, 1997, Plaintiff's condition had improved as a result of the medication. On April 10, 1997, Plaintiff's condition remained the same as it was on April 1, 1997.

36. On April 13, 1997, Plaintiff's depression continued under control. She experienced a daily diffuse and floating headaches. One of her medications (benodiazepina) was corrected due to a poor compliance with medications.

37. Plaintiff cancelled her September 27, 1997 appointment with Dr. Núñez.

38. On October 4, 1997, Dr. Núñez considered that plaintiff was developing a resistance to the treatment.

8

CIVIL NO. 98-2395 (JP)

39. On November 25, 1997, Plaintiff kept her appointment with Dr. Nunez. On even date, Dr. Nunez's notes state that he believed that Plaintiff depicted a marked depressive picture. Dr. Nunez gave Plaintiff a medical certificate recommending that in view of an affective disorder, she should be absent from work until January 19, 1998.

40. On November 27, 1997, Plaintiff's mother died. Concurrently thereafter, and as a consequence thereto, she suffered a kind of depression that rendered her totally incapacitated.

41. On December 30, 1997, due to Plaintiff's continued depression, Dr. Nunez considered whether Plaintiff had suicidal ideas. Plaintiff denied having such ideas.

42. On January 15, 1998, Dr. Nunez filled out Plaintiff's insurance papers.

43. On January 28, 1998, Plaintiff's internist, Dr. Luis Raul Padilla diagnosed Plaintiff with a major psychotic level depression.

44. On January 29, 1998, Plaintiff continued to feel anxious and preoccupied. Plaintiff did not sleep or eat. Her legs trembled, she lost weight and constantly thought about her bad condition.

45. On February 9, 1998, the State Insurance Fund diagnosed Plaintiff with anxious traits despite being oriented in time, place and person, and having a good immediate, recent and remote memory.

46. On February 19, 1998, plaintiff's depressive condition continued. She exhibited psychomotor retardation and anhedonia symptoms.

47. In March 1998, Plaintiff continued to be depressed with anhedonia. Plaintiff also suffered from numerous muscular aches in her head and shoulders, in addition to tremors.

AO 72A
(Rev 8/82)

CIVIL NO. 98-2395 (JP)

48. By March 13, 1998, Plaintiff was suffering from muscular contractions as a result of her depression.

49. On March 24, 1998, Plaintiff experienced fine tremors and continued psychomotor retardation.

50. At no relevant time was Plaintiff hospitalized in a mental hospital.

### III. SUMMARY JUDGMENT STANDARDS IN THE CONTEXT OF ADEA CASES

Summary judgment serves to assess the proof to determine if there is a genuine need for trial. Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir. 1990). Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, [in this case the plaintiff,] reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Zambrana-Marrero v. Suárez-Cruz, 172 F.3d 122, 125 (1st. Cir. 1999) (stating that summary judgment is appropriate when, after evaluating the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); Goldman v. First Nat'l Bank of Boston, 985 F.2d. 1113, 1116 (1st Cir. 1993); Canal Insurance Co. v. Benner, 980 F.2d 23, 25 (1st Cir. 1992). The Supreme Court has stated that "only disputes over facts that might affect the

10

CIVIL NO. 98-2395 (JP)

outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. See Mack v. Great Atl. And Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st. Cir. 1989).

In a summary judgment motion, the movant [in this case the defendant], bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2253, 91 L.Ed.2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party [in this case the plaintiff] who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. See Anderson, 477 U.S. at 248, 106 S. Ct. at 2510; Celotex, 477 U.S. at 324, 106 S. Ct. at 2553; Goldman, 985 F.2d at 1116. Moreover, in order to survive a motion for summary judgment in the context of an ADEA action, "a plaintiff must establish [that] at least a genuine issue of material fact [exists]

11

CIVIL NO. 98-2395 (JP)

on every element in his case in chief." <u>Vega v. Kodak Caribbean, Ltd.</u>, 3 F.3d. 476, 479 (1st Cir. 1993) (quoting <u>Mesnick v. General Elec. Co.</u>, 950 F.2d 816, 825 (1st Cir. 1991)).

There are two distinct frameworks for assessing evidence of discrimination which are based on whether the evidence proffered by a plaintiff is direct or of a circumstantial nature. See <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). Direct evidence "consists of statements by a decision-maker that directly reflect the alleged animus and bear squarely on the contested employment decision." <u>Febres v. Challenger Caribbean Corp.</u>, 214 F.3d 57, 60, (1st Cir. 2000). Such evidence, if believed by the fact-finder, warrants a burden shift and that a mixed-motives instruction be given to the jury. <u>Id.</u> at 60-61. Further, direct evidence, standing alone can show a discriminatory animus. See <u>Jackson v. Harvard Univ.</u>, 900 F.2d 464, 467 (1st Cir. 1990). In the absence of direct evidence, age discrimination claims must be reviewed under the burden-shifting <u>McDonnell Douglas</u> frame-work. <u>Greenberg v. Union Camp Corp.</u>, 48 F.3d 22, 26 (1st Cir. 1995).

As evidence of Defendant's age animus, Plaintiff alleges that one of her supervisors, Larry Cancel, made frequent derogatory comments to women in his department, referring to them as "las nenas de Cancel", "las viejas", and "viejas cayucas". She alleges that he also stated that they had "queso en la cabeza". (Plt's Opp. to

12

CIVIL NO. 98-2395 (JP)

Sum. J. at 3.). Even if this is true, the thrust of Plaintiff's evidence of Defendant's alleged age animus is limited to insensitive boorish comments that were made by one of her supervisors. These comments, in and of themselves, do not amount to direct evidence of age animus. See Jackson, 900 F.2d at 467. Moreover, they also do not amount to direct evidence of age bias when considered alongside the fact that Plaintiff received a higher salary as a result of her transfer within the company. Clearly, Plaintiff has not produced any evidence consistent with direct evidence of age discrimination in this case. Therefore, the McDonnell Douglas framework guides our inquiry.

When applied in an ADEA context, the McDonnell Douglas standard requires that a plaintiff set forth a prima facie case by showing that he (1) is over 40 years of age; (2) met the employer's legitimate job performance expectations; (3) experienced an adverse employment action, and (4) was replaced by a person with roughly equivalent job qualifications. See Vega, 3 F.3d at 479; Freedman v. Package Mach. Co., 865 F.2d 1331, 1335 (1st Cir. 1988). If a plaintiff overcomes this hurdle, then the burden of production, but not the burden of persuasion, shifts to the defendant employer to state a legitimate non discriminatory justification for the employment decision. Hazel v. United States Postmaster Gen., 7 F.3d 1, 3 (1st Cir. 1993). The burden of persuasion, as opposed to the

13

CIVIL NO. 98-2395 (JP)

burden of production remains with the plaintiff throughout, regardless of whether the evidence presented in an ADEA action is direct or circumstantial. See Serrano-Cruz v. DFI Puerto Rico Inc., 109 F.3d 23, 26 (1st Cir. 1997).

Once a defendant produces a legitimate non-discriminatory purpose for the employment decision, the presumption of discrimination established by the prima facie case disappears. See Sánchez Sepúlveda v. Motorola Electrónica De Puerto Rico, Inc., 988 F. Supp. 34, 37 (D. Puerto Rico 1997) (Pieras, J.). At this point, in order to survive a judgment as a matter of law, a plaintiff must demonstrate that the defendant's stated reason for the employment decision is false. See Williams v. Raytheon Co., 220 F.3d 16 (1st Cir. 2000).[2]

IV. **LEGAL ANALYSIS**

Plaintiff Meléndez alleges that she was constructively discharged by Defendant Cutler Hammer when she was transferred from her position as Accounting Manager to that of Financial Reporting Administrator. To this end, she argues that she had little or no

---

[2] The Supreme Court has recently held that it is no longer necessary for a plaintiff to go the extra step of proving that a defendant employer's proffered reason for an employment decision is a cover-up for discrimination in order to survive a judgment as a matter of law under the McDonnell Douglas framework. See Reeves v. Sanderson Plumbing Products Inc., -- U.S. -- , 120 S. Ct 2097, L.Ed. 2d 105 (2000). In this way the Supreme Court has recognized that, "[p]roof that the defendant's explanation is unworthy of credence is . . . one form of circumstantial evidence that is probative of intentional discrimination." Id. at 2108.

14

CIVIL NO. 98-2395 (JP)

responsibilities in her new post as Finance Reporting Administrator, and that she felt isolated and believed that she had been unjustly marginalized and relegated to an insignificant position within the company on account of her age. In this way, Meléndez claims that the transfer constituted Cutler Hammer's adverse employment action against her, which in turn resulted in her constructive discharge from the company. In view of the summary judgment record, the Court finds that Plaintiff has failed to establish (1) that she met Cutler Hammer's legitimate job expectations for the position of Accounting Representative, and (2) that she suffered the adverse employment action of being constructively discharged.

### A. Legitimate Job Performance Expectations

Plaintiff's allegations that she met Defendant's legitimate job performance expectations are simply that; allegations. Plaintiff has not come forth with affidavits or other affirmative evidence to counteract Larry Cancel's deposition testimony that she did not meet Defendant's job expectations because 1) she failed to provide satisfactory income variance reports as Accounting Manager; 2) she failed to do in-transit account for several months, and 3) she gossiped at work. (Def. Mot. Sum. J. Exh. E.) Plaintiff has also not come forth with affidavits or affirmative evidence to counteract the deposition statements of fellow Cutler Hammer employee Jason Hume who testified that Plaintiff did not provide him with necessary

CIVIL NO. 98-2395 (JP)

accurate and timely responses to job related accounting questions. (Def. Mot. Sum. J. Exh. K.) Finally, Plaintiff has not come forth with evidence to counteract the litany of deficiencies in her work-product as Accounting Manager which were enumerated in the affidavit of Luis F. Pizarro. (Def. Mot. Sum. J. Exh. L.) Robert Irizzary testified to the same in his deposition. (Def. Mot. Sum. J. Exh. J.)[3]

For these reasons, the Court finds that Plaintiff has failed to affirmatively show that she met Defendant Cutler Hammer's minimal job expectations as Accounting Manager. This finding alone is sufficient to allow this Court to grant summary judgment in favor of Defendants because it reflects that Plaintiff 1) has not brought forth a prima facie case, and 2) has failed to establish that a genuine issue of material fact exists on the question of whether she met Defendant's legitimate job performance expectations. See Vega, 3 F.3d. at 479.

---

[3] While these sections of Luis F. Pizarro's affidavit and Robert Irizarry's deposition transcript refer to discoveries concerning Plaintiff's work product as Accounting Manager **after** she was transferred to the Finance Reporting position, and were therefore not part of the Defendant's employment decision, they serve to buttress the proffered basis for Defendant's employment decision.

Tarcilla (Tata) Ballester, one of Plaintiff's work subordinates states that she believed that Plaintiff "supervised well" and "knew her job very well" (Plt Opp. Sum. J. Exh. 3.) However, Ms. Ballester was not one of Plaintiff's supervisors and Plaintiff was not her responsibility. Ms. Ballister was a member of Plaintiff's staff, and as such, is not in a position to evaluate Plaintiff's work-product in the same manner or with the accuracy as could a superior or same level colleague. In addition, her job was not to evaluate and supervise Plaintiff. Therefore, she can only offer a general commentary, not directed to Plaintiff's job evaluation. In this way, her statements do not effectively contradict the statements of Larry Cancel, Jason Hume, Luis Pizarro or Robert Irizarry.

16

CIVIL NO. 98-2395 (JP)

Nonetheless, the Court is of the opinion that it should further address other deficiencies in Plaintiff's argument against summary judgment, namely her constructive discharge allegation.

**B. Constructive Discharge**

Case law on constructive discharge for ADEA claims is straight forward. In the same way that the ADEA prohibits an employer from firing an employee because of his age, so too does it prohibit an employer from engaging in a calculated, age-motivated effort to force an employee to resign. Accordingly, a constructive discharge can anchor an employment discrimination claim. See Ramos v. Davis & Geck, Inc., 167 F.3d. 727, 731-33 (1st Cir. 1999). Suárez v. Pueblo Int'l Inc., 229 F.3d 49 (1st Cir. 2000), a recent ADEA decision by this Circuit which bears a striking similarity to the case at hand, lays forth a blueprint for determining what employment actions constitute a constructive discharge. According to Suárez, in order to determine whether a Plaintiff has made out a constructive discharge claim under the ADEA, the reviewing court "must gauge whether the working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." Id. at 54. In this way, the test is objective in nature, and as such, requires a reasonable person analysis.

The Suárez plaintiff, a man in his late fifties, sued his former

17

AO 72A
(Rev.8/82)

CIVIL NO. 98-2395 (JP)

employer alleging that he was constructively discharged as a result of his employer's decision to relocate his staff, exclude him from operational meetings, and relegate him to a position in which he had to develop third-party clients. See id. at 55. He complained that the negative remarks that his employer made about his age created a hostile environment in the workplace that, coupled with his unwanted transfer, justified his decision to resign from his post. The plaintiff suffered an injury to his ego and prestige. In essence, the plaintiff in Suárez felt marginalized and isolated, and consequently developed a depressive illness.

After reviewing the record, the Appellate Court affirmed the District Court's decision to grant summary judgment in favor of the defendant employer. The Court reasoned that mere corporate reorganization, routine managerial decisions, and criticism of an employee's work that could be described as petty tyranny without more is insufficient to rise to the level of a constructive discharge. See id. at 54-55. The Court specifically stated that "a reduction in responsibility or a change in the way that business is done, unaccompanied by diminution of salary or some other marked lessening of the quality of working condition, does not constitute a constructive discharge." Id. at 55, (citing Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 135-36 (7th Cir. 1993)) (holding that a mere change in job responsibilities without a concomitant loss of

18

AO 72A
(Rev.8/82)

CIVIL NO. 98-2395 (JP)

salary or benefits was not an adverse employment action under the ADEA). Speaking for the Court, Judge Selya emphasized that "[t]he workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins - thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world. Thus the constructive discharge standard, properly applied, does not guarantee a workplace free from the usual ebb and flow of power relations and inter-office politics." Id. at 54.

Suárez is analogous to the instant case. Accordingly, its precedent shall control. Plaintiff has not shown that there were problems with her new position of Finance Accounts Manager that would compel a reasonable person to resign. Her main complaint is that she was not given substantial work to do. After the transfer her salary was increased, and she was even permitted to take significant leaves of absences in order to attend to her medical condition. Plaintiff voluntarily resigned from her job, but has not provided any evidence to support a claim that her working conditions as Finance Accounts Manager were "so onerous, abusive, or unpleasant that a reasonable person in [her] position would have felt compelled to resign." Id. at 54. However, the Suárez plaintiff is more compelling because he developed a depressive illness as a result of his transfer. Here, the evidence does not show that Plaintiff's depressive illness was a direct result of her transfer. The record reflects that Plaintiff

19

CIVIL NO. 98-2395 (JP)

had been suffering from a depressive disorder before the transfer. In sum, in addition to not being able to affirmatively demonstrate that she met Defendant's legitimate job expectations, Plaintiff has also failed to establish that she was constructively discharged by Defendant Cutler Hammer. In this way, she cannot lay forth a prima facie case under the ADEA.

### V. CONCLUSION

In view of the foregoing discussion, this Court hereby **GRANTS** Defendant's Motion for Summary Judgment. Having dismissed Plaintiffs' claims under the ADEA the Court declines to exercise supplemental jurisdiction over the Puerto Rico law claims.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 21st day of November, 2000.

JAIME PIERAS, JR.
U.S. SENIOR DISTRICT JUDGE