RECEIVED AND FILED
2002 APR 30 AM 8:34
CLERKS OFFICE ANNEX
U.S. DISTRICT COURT
OLD SAN JUAN, P.R.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

IVY MELENDEZ-ARROYO,                          *
                                              *
        Plaintiffs                            *
                                              *
vs.                                           *        CIVIL NO. 98-2395 (JP)
                                              *
CUTLER HAMMER DE P.R.,                        *
                                              *
        Defendant                             *
                                              *

## ADDITIONAL INITIAL SCHEDULING CONFERENCE ORDER

**I.    INTRODUCTION:**

The parties met with the Court on April 25, 2002, for an Additional Initial Scheduling Conference to discuss the time-bar issue, represented by counsel:  Judith Berkan, Esq., and Mary Jo Méndez, Esq., for Plaintiff; and Russell Del Toro, Esq., Alice Velázquez, Esq., and Roberto Santana, Esq., for Defendant.

**II.   UNCONTROVERTED FACTS OF THE PARTIES:**

The following uncontested facts are hereby incorporated into this Order:

1.   Plaintiff was out on sick leave from February 19, 1997 to February 26, 1997 and from March 26, 1997 to May 12, 1997.

2.   Plaintiff remained in the new position until November 6, 1997, at which time she went out on sick leave.  Plaintiff never again worked for the company.

3.   Dr. Raúl Núñez has been Plaintiff's treating psychologist from March 11, 1997 to the present.

4.   On November 27, 1997, Plaintiff's mother died.

5

CIVIL NO. 98-2395 (JP)                2

5.  Plaintiff contends that in November 1997, Plaintiff was diagnosed as having a severe depression with melancholia. Defendant does not agree with this characterization of the medical condition.  Defendant agrees that Plaintiff was treated by Dr. Núñez and that Dr. Núñez wrote the notes which are attached as **EXHIBIT A** and **EXHIBIT B**, and made to form part of this ISC Order.

6.  On January 22, 1998, Plaintiff's internist, Dr. Luis Raúl Padilla, made a diagnosis of major depression at a psychotic level.  The fact that Dr. Padilla made this conclusion is not disputed.  However, Defendant disagrees with the conclusion.

7.  A charge was filed before the EEOC and the Anti-discrimination unit on March 4, 1998, by the attorney who filed it.

8.  The accrual date for Plaintiff's cause of action is February 14, 1997.

9.  Absent tolling, the 300-day limitation period for filing a charge with the EEOC expired on December 11, 1997.

10. Absent tolling the 365-day limitation period to file an action under Puerto Rico Act 100 expired on February 14, 1998.

11. On March 4, 1998, a charge was filed on Plaintiff's behalf with the anti-discrimination unit of the Puerto Rico Department of Labor and the EEOC anti-discrimination unit.

12. According to the charge filed with the anti-discrimination unit, Plaintiff swore it on February 26, 1998, but it was filed on March 4, 1998.

CIVIL NO. 98-2395 (JP)                3

13. Plaintiff received Defendant's old and new employee manuals. Defendant gave Plaintiff the new employee manual on February 8, 1997, six days before her transfer. On even date, a full day seminar was given at the Condado Plaza Hotel to all managerial employees regarding Eaton's policies and the new manual. Plaintiff attended this seminar.

14. Plaintiff also attended a full day seminar on Labor Law conducted by attorney Ruy Delgado Zayas on October 24, 1993.

15. Plaintiff's mother died on November 27, 1997.

16. On or before January 15, 1998, the company's nurse gave Plaintiff the SINOT claim form. On that date, Plaintiff took them to her psychiatrist to fill them out.

17. On Friday, January 16, 1998, Plaintiff went to the Company to deliver the SINOT claim form and spoke with the company's nurse to tell her she wanted to start working.

18. The company nurse received the SINOT claim form and upon reviewing them, gave Plaintiff a State Insurance Fund claim form on the same day; advising her to go to the SIF.

19. At no relevant time was Plaintiff hospitalized in a mental institution.

III. **PLAINTIFF'S ALLEGATIONS**:

Plaintiffs' allegations, as set forth in her ISC Memorandum, are hereby incorporated by reference.

IV. **DEFENDANT'S ALLEGATIONS**:

Defendant's allegations, as set forth in their ISC Memoranda, are hereby incorporated by reference.

CIVIL NO. 98-2395 (JP)                    4

## V.   <u>**CONTROVERTED FACTS AND ISSUES**</u>:

Whether Plaintiff is time barred from bringing this action or whether the time limit within which Plaintiff should have filed her administrative complaint should be tolled.

## VI.   <u>**PRELIMINARY ORDERS**</u>:

A.   During the conference the parties were not able to agree on various proposed uncontested facts.  Therefore, **on or before May 10, 2002**, Plaintiffs **SHALL** file an informative motion that lists facts that she can stipulate to that relate to Defendant's proposed uncontested facts Nos. 9, 12, 13, 15, 16, 20, 21, 22, 23, 24, and 25.  Further **on or before May 10, 2002**, Defendant **SHALL** file an informative motion that lists facts that it can stipulate to that relate to Plaintiff's proposed uncontested facts Nos. 30, 31, 33, 35, and 40.

B.   Plaintiff has provided the Court with a copy of the original expert witness report of her expert, Dr. Haydeé Costas, M.D.  The Court hereby incorporates this report into this ISC Order as **Exhibit C.**  If Plaintiff wishes to file an updated expert witness report by Dr. Costas, she shall do so **on or before May 9, 2002.**

C.   Defendant has provided the Court with the original expert witness report and the updated expert witness report of its expert Dr. Luis Raúl Alfaro, M.D.  The Court hereby incorporates these reports into this ISC Order as **Exhibit D** (Defendant's Original Expert Report) and **Exhibit E** (Defendant's Updated Expert Report).

CIVIL NO. 98-2395 (JP)                    5

      D.   **On or before May 15, 2002,** Plaintiff **SHALL** produce her credit card expenditures for the relevant periods from September 1997 to November 1998).

**VII. <u>WITNESSES</u>:**

      A.   Plaintiff: the witnesses for Plaintiff are listed in its ISC Memorandum. The Court hereby incorporates Plaintiff's list by reference.

      B.   Defendant: the witnesses for Defendant are listed in their ISC Memoranda. The Court hereby incorporates Defendant's lists by reference.

Additional witnesses will not be allowed because this will create undue prejudice to the opposing party. If any party wishes to use any additional witnesses, it will be discretionary with the Court, provided that the parties state in writing on or before **May 24, 2002,** the following information regarding each additional witness: name and address with a short statement as to the subject matter of their testimony, and proof that the names of these witnesses, or the fact that their testimony was decidedly material, was not known at the time of this Initial Scheduling Conference, and the reason why they were not known. In the case of a proposed expert witness, the party requesting leave to amend the witness list shall also provide the expert's report to the Court and to the defendant within two weeks of the request, which must include all the information specified in Rule 26(2)(B) of the Federal Rules of Civil Procedure and any information requested in the Initial Scheduling Conference Call. If any party decides not to use a witness listed herein at trial, it shall notify all other parties at least fifteen days before trial. Failure to provide such notice may result in

CIVIL NO. 98-2395 (JP)              6

sanctions, including an instruction to the jury that it may presume that the party did not call the witness to testify at trial because the witness' testimony was adverse to its case.

Noncompliance with this Order will result in such witnesses not being allowed to testify at trial.  The Court expressly reserves its decision as to whether the reasons given constitute good cause shown to rebut the presumption that these witnesses should be excluded. The party informing new witnesses must produce them at its own cost for depositions to be scheduled by the other party, to be taken within two weeks if it so desires.

**VIII. DOCUMENTARY EVIDENCE**:

    A.    Plaintiff:  Plaintiff has listed her documentary evidence in her ISC Memorandum.  The Court hereby incorporates this list by reference.

    B.    Defendant:  Defendant has listed its documentary evidence in its ISC Memorandum.  The Court hereby incorporates this lists by reference.

No other documents will be admitted without leave of Court.  If any party wishes to use any document not listed herein, it must serve the document on all other parties and notify the Court of its intent to use the document, explaining its relevance and why its existence or materiality was not known at the time of this Conference, on or before **September 24, 2002**.  The Court expressly reserves its decision as to whether any document not specifically listed in this Order will be admitted.

**IX.  DISCOVERY**:

    The parties have agreed that they will conduct only the following discovery:

CIVIL NO. 98-2395 (JP)                    7

A.   Plaintiff

   1.   Depositions:

      a.   **May 17, 2002, at 1:30 p.m.,** at the offices of
           Plaintiff's attorney at Defendant's cost: **Dr.
           Raúl Alfaro (Psychiatrist)**.

      b.   **June 3, 2002, at 10:00 a.m.,** at the offices of
           Plaintiffs' attorney at Defendants' cost and to
           be produced by Defendant if this witness is
           still an employee of Cutler Hammer: **Elba Ayala
           (co-worker)**.

B.   Defendant

   1.   Depositions:

      a.   **May 15, 2002, at 9:30 a.m.,** at the offices of
           Defendants' attorney at Plaintiffs' cost: **Dr.
           Luis Raúl Padilla**.

      b.   **May 17, 2002, at 9:00 a.m.,** at the offices of
           Defendants' attorney at Plaintiffs' cost: Dr.
           Haydeé Costas.

All depositions are taken day-to-day until finished. All the
discovery the parties are to conduct has been scheduled herein with
their knowledge and consent. Unless the parties agree otherwise,
depositions that begin in the morning shall break for lunch at 12:30
p.m. and shall resume at 1:30 p.m. No further discovery is to be
allowed without leave of the Court, and if leave is granted, the
rules as herein stated apply to this further discovery. If any other
judge schedules anything for the same date as any of the scheduled
depositions, the attorney is to inform that judge that by order of
this Court the depositions in this case have already been scheduled

CIVIL NO. 98-2395 (JP)              8

and that this Order because it was entered first takes precedence over the others.  The Court includes this section as part of the foregoing Order after having been brought to the Court's attention by an attorney in <u>De Jesús Colón, et al. v. Toledo Dávila, et al.</u>, Civ. No. 99-1511 (JP).

**X.    <u>JOINDER</u>:**

Any motions for joinder of parties, for amendment of pleadings or third-party complaints must be filed on or before **May 24, 2002.**

**XI.   <u>SCHEDULE WITH THE COURT</u>:**

The Pretrial Conference for the Hearing on time bar in this case is **SET** for **June 19, 2002, at 4:00 p.m.  On or before June 10, 2002,** the parties **SHALL** file a Joint Proposed Pre-Trial Order in accordance with Local Rule 314.3.  As the Pre-Trial Conference will also serve as a settlement conference, the attorneys are **ORDERED** to have their clients available by phone, under penalty of fine during the Pre-Trial Conference.  The attorneys are informed that the Court expects that they be prepared and able to contact their client or a  person capable of making a final call on a settlement figure during the conference.   The hearing on the time bar issue is **SET** for **June 26, 2002 at 9:30 a.m..  <u>On or before June 20, 2002</u>**, the parties **SHALL:** (1) meet and mark all exhibits to be offered at trial, for identification; and (3) notify the Court in writing whether any witnesses will require the assistance of an interpreter.  Failure to comply with this Order is at the risk of the proponent of the evidence not submitted in accordance with the above requirements.

The dates specified herein were agreed to or otherwise ordered by the Court at the Conference and the parties have been informed by the Court that they have to comply with such schedule regardless of

CIVIL NO. 98-2395 (JP)                9

the fact that this Order, in its written form, may not be entered before the event.  These dates shall not be changed.  If changed, the same is at the risk of the party interested in the information or discovery and in no event shall affect the subsequent course of the action as scheduled herein.  Fed. R. Civ. P. Rule 16.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 26th day of April, 2002.

JAIME PIERAS, JR.
SENIOR U.S. DISTRICT JUDGE

EXHIBIT 4

Name: Ivy Meléndez Arroyo (56 years old)

Date of birth: January 14, 1941

Civil Status: Divorced with three children.

Religion: Catholic

Actual employment:  Accountant-Cutler Hammer Toa Baja

Address: 21 Street 3, La Milagrosa Extension, Bayamón

Telephone: 740-3907

Companion: Alone

History record of personal and family mental illness.  Hysterectomy and ovaries.  Nine years ago three significant losses: 1) marriage of daughter  2) absent son in the army 3) abandonment by husband within three days of daughter's wedding.  In addition, in which destroyed her home.  She visited Dr. Saenz on that occasion.

Medications that she is taking at the present time:

Zoldi 10 mg. prescribed by Dr. Franceschini and Padró.

Tranxene 7.5 mg (I don't take them because I fall asleep)

Norvasc 10 mg (hypertension)  Premarin .9

Reason for Consultation:  Work Problems

March 11, 1997    CC-Insomnia, nervousness, loss of appetite, sadness, frequent crying, hopelessness, jitterism.  She feels discriminated against and threatened (?) by boss.  She has all the characteristics of the picture of adjustment and mixed mood disorder.  Explore work environment.

M Status – compatible with

R/O

Dx Adjustment disorder and mixed mood

Rx Prozac 20 milligram capsules t bid  # 30 chlordiazepoxide 10 milligrams- #6Q

2

TAM... TT #60 - ("Librium")

Return Consultation T Week

March 26, 1997

Patient with clinical picture must more intense compatible with a mayor depression. Patient is recommended to rest during the next three weeks from her habitual work.

Prescription:        Alprazolame 0.5 mg. T or 1/2 b.i.d. TH-S.

                     Discontinue chlordiazepoxide

                     Continue with Prozac 20 mg. a.m. q.d.

                     (Certified)

April 1, 1997 - Improved with medication. In second stage of reaction of loss. RTC T week.

April 10, 1997 - Patient continues in the same condition, continue with the same medication - RTC T week.

April 17, _____

April 26, 1997 - Patient is referred to gastroenterology. CC - patient feeling well except for frequent diahrrea, soft and liquid. (illegible) M = RTC T week.

May 1, 1997 - Response from gastroenterologist Dr. Leonardo Castro. Continues improving thanks to Prozac and to introspective and support psychotherapy. Continue with previous medication. RTC T week.

                     (initials)

May 8, 1997  CC - Patient doing well. Will return to work next Monday. Certified.

Rx Prozac caps 20 mg #20 30 T b.i.d. to return on Saturday (10 days).

3

June 7, 1997 - doing well.  Working as a saleswoman for several products at the same time.

Rx Prozac 20 mg #30 T b.i.d.

RTC 1 weeks.

July 1, 1997 - Continues improving.

September 13, 1997.  Patient continues controlled in her depression.  Floating undefined anxiety almost daily accompanied by moderate frontal headache. The benzodiazepine is corrected due to poor compliance with medications.

Rx Prozac 20 mg. caps. #60 T b.i.d.

Motrin 10 mg. T b.i.d. #30

Leporin 0.125 mg. #30  T every 6 hours

Pushadlame 0.25 T t.i.d.

RTC 15 days

September 27, 1997 - She called up on the telephone and canceled the appointment because of illness (throat).  RTC  T week.

October 4, 1997 - Patient seems to be developing resistance.

November 6, 1997 - Patient calls in emergency.  Mother hospitalized in intensive care.  Patient very anxious, with hopelessness, with expectation confronting the imminent loss of her very old mother. The phases of mourning through which she will have to go upon losing her mother are explained to her at the intellectual level.

Certified - To be absent from her job for 2 weeks  from today onwards. Problems on the job more or less resolved.

Prescription - Chlorazepate 3.75 mg. b.i.d. or tablets TT h.s.

Patient continues on Prozac.

000552

4

November 25, 1997 - Patient with marked depressed picture.  She is given support and explained the factors for her depression.  Rx = ↑.

December 11, 1997 - Mourning for death of mother on November 27.  Emphasis is made on the fact that she continue with the same medication (illegible).

December 30, 1997 - Continues to be very depressed.  Suicidal idea is explored.  "Jesus, doctor!  I will never do it.

Novirgo 10 mg. #30        Glucotrol 10 mg #30

Prozac 20 mg #30          Chlorazepate 3.75 #45 T th

January 15, 1998 - Insurance claim forms are filled out.  Continues ↓.

January 29, 1998 - Patient extremely anxious and worried.  Referred to the nurse at work.  Does not sleep, her legs are shaking, does not eat, has lost weight and has constant thoughts about her poor situation.

Prescription  Prozac 20 mg. #30 T b.i.d.

            Flurazepam 30 mg. T h.s. #30

            RTC T week.

February 10, 1998:   No suicidal ideas, although she presents a severe depressed picture.  It is insisted that she continue with prescriptions and that she show up at appointments as indicated.

February 19, 1998:  She continues to be depressed.   Psychomotor slowness and (illegible).

Prescription (illegible) 0.25 mg #45 T t.v.d.

Prozac 20 mg. ----- 30 T b.i.d.

Form was filled out.

000553

5

March 13, 1998 - cc - Muscular contractions

Prescription Meprobamate 400 mg. #10 T h.s.

Norflex (illegible) #2 T TM.

March 24, 1998 - Intense headache bilateral paretal region up to the base of the neck. Shoulders are contracted and fine generalized tremors. Continues depressed with anhedonia. Psychomotor slowness is marked.

Impression: Severe major depression. Prozac is increased to 40 mg. q.d. and Pamelet tablets (illegible). Meprob 4(illegible)

April 27, 1998 - Patient with resistance. Appears sad and without makeup. Pressed in severe mourning, no energy, "I miss my mother". "I don't sleep, I don't have appetite." (illegible) suicidal.

Rx      Prozac 20 mg #30 T b.i.d.

        Flurazepam 30 mg #15 T h.s. prn.

        Return T week.

May 7, 1998 - Complains about generalized muscular pain specially in the back and in the left hip. Referred to physiatrist. RTC TT weeks. Sm continue with the same.

June 1, 1998 - No novelty encountered.

June 23, 1998 - All quiet on the Western Front.

Rx      Norvasc 10 mg.

        Prozac 20

        Glucotrol 10 mg.

        RTC TT weeks

August 1 st 1998 - has symptoms in the muscular skeletal system(illegible)

Rx      Prozac

        Flurazepam

000554

6

August. (number is illegible) - Referred to the physiatrist.

continues with muscular-skeletal bothers

Rx.   Prozac 20 mg #30 T b.i.d.

September 17, 1998 - Social Security approved.  She feels safer.  Economic factor in solution.

Rx   Prozac 20 mg. #30

     Sig: Caps. T b.i.d.

     Levsin 0.125 mg. #30 T q/6 hours.

October 20, 1998 - Form filled out.  Improved with regard to the picture of depression.

Rx   Prozac caps 20 mg. #30 T b.i.d.

     Flurazepam 30 mg T h.s.

     RTC

December 15, 1998 - The depression picture is improved.

Rx   Glucotrol 10 mg - #30 T b.i.d.

     Norvasc 5 mg - #30 T b.i.d.

     Prozac 20 mg. - #30 T b.i.d.

     (illegible) - #30 T h.s.

January 14, 1999

Rx   Just like the previous one, continues with some improvement.

February 9, 1999 - Clear improvement in handling environmental factors.

Rx   Prozac 20 mg, (illegible)  1 mg. A.M.

     RTC TT weeks.

March 2, 1999 - In clear improvement of picture of depression. Rx =

March 23, 1999 - Patient continues the same.

000555

7

April 7, 1999 - She complains about muscular pains.

Rx - Previous medicines  SM - without novelty.

Relafen 600 mg T A.M.

May 20, 1999 - She complains about pains in the knee, back, etc.  Attributes symptoms to the fact that she narrated episode at her job to the new attorney.

She marked a mood with anxiety, slow flow of speech, relevant, coherent in content, "down hearted, they hurt me a lot".  Memories:  mood impaired.

Concentration difficult.  Depressive affect, anxious mood.  Judgment (illegible) are poor.

Referred to Endocrinologist for continuation of Diabetes.

Rx    Prozac - Relafen

I certify the foregoing is a true and correct translation of the following document: _____ its original in Spanish

Date: Jan. 11, 2000

Patricia Beckerley

Patricia Beckerley
Certified Court Interpreter



BERKAN/MENDEZ
OFICINA LEGAL
Las Marías 206
Urb. Hyde Park
Río Piedras, PR 00927

Judith Berkan                                                          (787) 764-0814
Mary Jo Méndez Vilella                                                  Fax 250-0986

                                                          June 29, 1999

*By messenger*

Roberto Santana Aparicio, Esq.
Marisol Vega Couto, Esq
Del Toro & Santana
Plaza Scotiabank, Suite 610
San Juan, P.R. 00917-1902

Re: *Ivy Melendez v. Cutler Hammer*

Dear counselors:

    Enclosed please find the medical records of Dr. Raúl Nuñez.

    As I indicated to attorney Vega yesterday, we are in the process of obtaining copies of the other medical record for plaintiff. As soon as we obtain a copy we will make them available to you.

                           Cordially,

                           Mary Jo Mendez

Nombre : Yny Meléndez Arroyo  (56 años)
Fecha de nacimiento : Enero 14, 1941
Estado Civil : Divorciada con tres hijos .
Religión : Católica .
Empleo actual : Contable : Cutlar Hamm Toa Ba
Dirección : Calle 3 R-21 - Ext La Milagrosa, Bay
Teléfono : 740-3907 -
Acompañante : Sola .

Historial de enfermedad mental personal y
stress familiar . 9 años atrás tres pérdidas significa
mía y tivas 1) matrimonio de hija 2) hijo ejército au-
varios sente 3) abandono por marido a los tres días
de casarse hija. Además fuego que destruyó su
hogar. Visitó Dr. Saenz en esa ocasión .
Medicamentos que toma en la actualidad
Zoloft 50 mg R por Dr. Franceschini y Padro
Tranxene : 7.5 mg (No me las tomo porque me quedo
                                                      dormida .
Norvase 10 mg (hipertensión) Premarin .9
#1    Móvil de consulta : Work Problems .
11 marzo) CC-Insom- wt loss app - sadness, freq. cry
1997) hopelessness, jitteriness - Se siente discrimi
nada y amenazada (?) por jefe. Tiene todas
las caract. de cuadro de desorden de ajuste c mix
mood . Explorar ambiente de trabajo.

Status M — compatible c̄

R/o
Dx - Adjustment disorder c̄ Mixed Mood
R̄ - Prozac caps. 20 mg ī b.q.d. # 30
    Chlordiazepoxide 10 mg — # 60 ī A.M. Tor ī̄
    # 60 —

RTC - ī week —

#2  26 de marzo de 1997 —

        Paciente con cuadro clínico mucho más
intenso compatible con una depresión mayor. Se
recomienda a la paciente descansar durante las
próximas tres semanas de su trabajo habitual.
    R̄ Alprazolam 0.5 mg  ī or ½ b.i.d. ī h.s
    Descontinuar chlordiazepoxide.
    Continuar con Prozac 20 mg A.M. q.d.
    (Certificado)

#3  1° abril 1997 — Mejorada con medicación. En
    segunda fase de reacción de pérdida. RTC ī week.


#4  10 abril /97. Paciente continúa = condición
    Continuar = medicación. - RTC — ī week

#5  17 de abril ————————

#6  26 abril/97  Paciente se refiere a Gastoenterología.
CC — Pt. feeling well except for frequent diarrea
soft and liquid  SM = RTC 1 week.

#7  1° de mayo 1997 — Respuesta del GT —
Dr. Leonardo Castro
     Continúa mejoría gracias al Prozac
y a psicoterapia introsp y sostén. Continúas
con medio anterior RTC 1 week.
                    R+M

#8  8 de mayo 1997 — CC Patient doing well
Will return to work next monday.
Certificado
     Rx Proozac caps 20 mg # 30 T b.i.
     To return on Saturday (10 days).

7 junio 1997 - Doing well. Trabajando Vendedor
de varios productos a la vez.
Rx - Prozac 20 mg # 30  ⊤ b.i.d.
RTC  ⊤ weeks.

1º de julio de 1997 - Continúa mejorando

13 sept. 1997 Paciente continúa controlada en
su depresión. Ansiedad flotante y difusa casi
diariamente acompañada de cefalea frontal mo-
rada. Se corrige la benzodiacepina debido
a poor compliance ē medication.

Rx Prozac caps. 20 mg ——— #60  ⊤ b.i.d.
Novasc 10 mg  ⊤ b.i.d.— # 30 -
Teusin 0.125 mg # 30  ⊤ q/6 hrs.
Alprazolam 0.25                ⊤ t.i.d.
RTC  15 days -
27 sept. 1997 — Llamó teléf y canceló cita por enferme
dad (garganta). RTC. ⊤ week.

Paciente parece estar desarr
rresistencia.

6 de noviembre 1997 - Paciente llama de emer
gencia. Madre hospitalizada en intensivo. Paciente
muy ansiosa, a la expectativa, desesperanzada ante la
muerte pérdida de su anciana madre. Se le explica a
nivel intelectual las fases del luto por las que vá a pa
cuando pierda a su madre.

Certificado para ausentarse de su trabajo x 2 sem
a partir de fecha de hoy. Problemas en el trabajo + o
resueltos.
    Rx Chlorazepate 3.75 mg b.i.d. os tabs ii h.s.
Continúa en Prozac.

25 de noviembre de 1997 - Paciente c cuadro dep.ᵃ marcado.
Se le dá sostén y se le explica los factores de su dep.ᵒⁿ
↑4 = ↑

11 de diciembre 1997 - Luto por muerte madre.
    el 27 nov.ᵉ. Se hace hincapié en que continue co
= medicación firmemᵉ.

30 de diciembre 1997 - Continúa muy deprimida se
explora idea suicida "¡Jesús, doctor!" "no lo hace ni
    Norvasc 10 mg # 30   Glucotrol 10 mg # 30
    Tonjaci 20 mg # 30   Chlorazepate 3.75 # 45 ii

para el seguro. Continua ↓

29 de enero 1998 - Paciente sumamente ansiosa y preocupada. Referida al Fondo por enfermera del trabajo. No duerme, le tiemblan las piernas, no come, la rebaja y tiene un pensamiento constante de su mala situación.

    ℞ Prozac 20 mg #30 ī b.i.d.
    Flurazepam 30 mg ī h.s. #30 —
    RTC ī week.

10 de febrero de 1998 : No idea. suicida, aunque presenta cuadro dep° severo. Se insiste q. continúe c̄ ℞ y que acuda a citas según indic°.

19 de febrero de 1998 —

    Continúa deprimida. Retardo psicomotor + anhedonia.

    ℞ Alprazolam 0.25 mg #45 ī t.i.d.
    Prozac 20 mg ——— 30 ī b.i.d
    Se llenó formularios —

13 marzo 1998 - CC - Contracturas musculares

    ℞ Meprobamate 400mg #10 ī h.s.
    Norflex Inject #2 ī ī M-

24 marzo/98 - Cefalea intensa en región de la región parietal bitateral hasta la nuca. Hombros contraído y temblor fino generalizado - Sigue deprimida c̄ anhedonia. Retardo psicom marcado Insm. Eta mayor severa. Se ↑° Prozac a 40 mg q dí. + Fioricet tab ī ī d. meprob 400mg hs.

17 abril 1998 — Paciente ¿asistencia? ...te
...nte y ↓ — sin maquillaje. Vestida ...rig. luto, desanimada.
...o de menos a mi madre." "No duermo, no tengo apetito."
...o idena. suicida.

R Prozac 20 mg #30 ⊤ b.i.d.
    Flurazepam 30 mg #15 ⊤ h.s. prn.
    RTC ⊤ week.

7 de mayo de 1998 — Aqueja dolores musculares generali-
zados sobretodo espalda y cadera izquierda.
Se refiere a fisiatría. RTC - II weeks.  S.M. Continúa.

16 de junio 1998 — Sin novedad en el frente.

23 de junio 1998   All quiet in the W.F.

R Norvasc 10 mg
   Prozac 80
   Glucotrol 10 mg
   RTO II weeks

1º agosto 1998 : Aparenta sintatizaciones en
rpto. mus. entre sq. al

R Prozac
   Flurazepam.

3 agosto 98      Referido al fisiatra

Sigue c̄ molestias muscu-esq.

℞ Prozac 20 mg # 30   Ī b.i.d.

17 de sept./98 — Seguro Social aprobado.
Se siente + segura. Factor económico en
solución

Rx Prozac 20 mg ——— # 30.
Sig: Caps. Ī b.i.d.
Leusin 0.125 mg ——— # 30 Ī q/6 hrs

20 de octubre 1998 — Se le llenó formulario
Mejorada cuadro depresivo.

℞ Prozac caps. 20 mg ——— # 30 Ī b.i.d.
Flurazepam 30 mg Ī h.s.
RTC —

5 de dic/98 — Mejorada de
cuadro depresivo.

14 enero/99
℞ igual anterior
Continúa con
alguna mejoría

℞ Glucotrol 10 mg — # 30 Ī b.i.d.
Prozac 5 mg — # 30 Ī b.i.d.
Propia 20 min — # 30 Ī b.i.d.
Flurazepam 30 mg — # 30 Ī h.s.

9 de febrero 1999 — Franca mejoría al mejora
¡actores ambientales.
        Rx Prozac 20 mg, Alpraz 1 mg A.M.
        RTC II weeks.

2 de marzo 1999 — En franca mejoría de cuad
depresivo. R =.

23 marzo 1999 — Pac.º continúa =.

17 abril/99 — Se queja de dolores muscula
... Rx = medic anterior — SM — Sin novedad.
        Relafen 500 mg T A.M.

20 mayo/99    Aqueja dolor en rodilla es-
palda, etc. Achaca sintomat al hecho de que
relató episodio en su trabajo a nueva abogada.
SM — marked ↓ mood ē anxiety, slow flow of speech.
Relevant, coherent, in contact. "Down hearted, me
hicieron mucho daño". Memories: mod. impaired.
Concent: diff. Dep. affect, anx mood. Jud y in righ
anx poor.
        Se refiere endocrinólog para cont. Diabet.
        Rx Prozac — Relafen.



## *Haydée Costas, M.D., F.A.P.A.*

P.O. BOX 191984
SAN JUAN, PR 00919-1984
TELEPHONE: (787) 754-0585

<u>PSYCHIATRIC REPORT</u>

**DATE :**     **August 20, 1999**

**TO   :**     **Berkan-Méndez Law Offices**

**RE   :**     **Ivy Meléndez vs. Cutler-Hammer**

<u>LEGAL QUESTION:</u>     <u>Mental competency from November 1997 to February 1998</u>
                          **Addendum to Psychiatric Evaluation dated August 8, 1999**

Mrs. Ivy Meléndez gives history of a depressive episode following her employer's decision to demote her on February 1997.  We have available medical documentation from her treating psychiatrist Dr. Nuñez, which reflects that he started treating her on March 11, 1997.  At that time she was already using the antidepressant Zoloft, prescribed by another psychiatrist.  Dr. Nuñez initial diagnosis was "Adjustment Disorder with mixed anxiety and depression."  He discontinued use of Zoloft and started her on the antidepressant Prozac and a tranquilizer.  In the next appointment, March 26, he stated that her symptoms were more severe than initially assessed and changed her diagnosis to Major Depression, recommending a sick leave of three weeks.  In the progress note dated May 1, 1997, Dr. Nuñez stated that Mrs. Meléndez had improved "with the use of Prozac, and insight-oriented and supportive psychotherapy."  On May 8, 1997 he wrote: "Patient doing well. Will return to work next Monday."

According to the history provided by Mrs. Meléndez, she was able to return to work.  She informed that she attempted to deal with her new situation at work as best as she could, and that she required from her employer a better definition of her new responsibilities.  Unfortunately, on November 1997, her mother became seriously ill and subsequently died.  Mrs. Meléndez explained that this new added stressor precipitated a new episode of acute depression.  She informed that she was then forced to take an extended sick leave which lasted until January 20, 1998.  She referred that the day she reported back to work, her employer found her so upset that referred her to the State Insurance Fund for psychiatric treatment.  She said that she subsequently requested and was granted total disability benefits by the Social Security disability determination program.

Documentation provided by Dr. Nuñez corroborates Mrs. Meléndez' information.  The progress note dated November 6, 1997 describes Mrs. Meléndez as "anxious and desperate", fearing the impending death of her mother.  The progress note dated November 25, 1997 states: "Patient with a pronounced depressive clinical picture."  The note of December 30, 1997 states: "Continues

very depressed." Subsequent notes describe Mrs. Meléndez as: "Patient very anxious and worried"; "unable to sleep, her legs shake, is unable to eat, has lost weight and has persisting thoughts regarding her difficult situation." Progress note on February 10, 1998 states: "No suicidal ideas but presents a severe clinical depression." It is not until the progress notes of May and June 1998 that a partial improvement of symptoms is implicitly reported.

## ANSWER TO THE LEGAL QUESTION:

Based on above information, it is my professional opinion, with a reasonable degree of medical certainty, that Mrs. Meléndez went through a severe depressive episode during the period of time encompassing November 1997 to February 1998. According to both herself and her treating psychiatrist, she exhibited severe depressive symptoms which markedly impaired her capacity to function, both at the occupational and personal levels. I can thus certify that at such time she had a severe mental condition which impaired her ability to react adequately to life circumstances and to assume an assertive style of handling her personal circumstances, including her decision to file a legal complaint.


**Haydée Costas, M.D., FAPA**
     **Psychiatrist**
**Diplomate of the American Board of**
     **Psychiatry and Neurology**

2

~~UPDATED~~ ORIGINAL P Report
~~(updated)~~

*Luis Raúl Alfaro, M. D.*
PSIQUIATRA

EXHIBIT D 

OFIC. 751-8209

CONDOMINIO MIDTOWN
SUITE 214
AVE. MUÑOZ RIVERA 421
HATO REY, P.R 00918

August 19, 1999

## PSYCHIATRIC EVALUATION

NAME                  Ivy Meléndez Arroyo
SOCIAL SECURITY       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
ATTORNEYS             Del Toro & Santana

The patient was interviewed on August 16, 1999.

IDENTIFICATION: Mrs. Meléndez is a 58 year old, female, divorced, mother of 3 children with ages 38 to 30 with a B.B.A. grade of education. Occupation: Accounting Manager. Unemployed since November 6, 1997.

HISTORY OF PRESENT ILLNESS: Chief Complaints: sadness; insomnia; nervousness; forgetfulness; intolerance to noises; tends to be alone.

Onset of Present Illness: Mrs. Meléndez dates the onset of her present illness back to February 14, 1997 when she was told by her direct supervisor, controller of the company Cutler Hammer of P. R., Mr. Larry Cancel, that she was going to be demoted. Mrs. Meléndez states that no specific reasons for the demotion were verbalized by the controller. Mrs. Meléndez says that she turned very nervous with chest tightness and the day after visited her cardiologist who evaluated her and prescribed an antihypertensive pill and also a tranquilizer. The physician also gave her a certificate of two weeks rest recommendation. Mrs. Meléndez returned to work setting but "no duties were assigned to her". She then went to see Mr. Luis Pizarro, Director of Personnel office who allegedly said to her that Mr. Cancel still had not give instructions of what kind of duties she was supposed to perform. Mrs. Meléndez states that this situation lasted almost three months. During that time she only tried to help her co-workers doing their jobs. She says that she felt humiliated and rejected. She went to see a Psychiatryst, Dr. Raúl A. Núñez Díaz in March 11, 1997 who diagnosed an Adjustment Disorder with mixed mood prescribing Prozac (antidepressant) 20 mgs. and Librium 10 mgs (a minor Tranquilizer). Two weeks later he found the patient more depressed changing the tranquilizer to Alprazolam (Xanax) and recommended three weeks of rest.

On May 12 she was assigned to perform some duties that were not what she was used to. She continued visiting the Psychiatrist.

On November 27 her mother died and her emotional condition worsened. A sick leave was granted to her. She reported to work in January 20, 1998 and was told by the Personnel Office Supervisor that she should report to the State Insurance fund.

Page 2
Ivy Meléndez Arroyo...

Mrs. Meléndez States that the case was not related by the
S.I.F. and that she still is waiting for the papers of The
Agency (S.I.F.) of non-related decision.

Mrs. Meléndez is still on treatment with Dr. Núñez López in a
monthly basis.Prozac and Flurazepam are prescribed to her.

<u>Past and Family History</u>:  Mrs. Meléndez was born in Barceloneta,
Puerto Rico in January 14, 1941.  Birth and early development
uneventful.  She is the youngest of two siblings.  Parents;
both dead.  The patient claims that her relationship with
relatives is good; that she started working at the age of
17.  Has been receiving Social Security benefits since
May, 1998.  At the time of marriage patient was 20 years
old getting divorced 12 years ago.  The patient came accompanied
by her sister by private transportation.  She denies the use of
alcohol or drugs.  There is history of physical illness at the
present time:  Diabetes Mellitus; Arterial Hypertension; Irritable
Bowel Syndrome.

<u>Daily Activities</u>:  Mrs. Meléndez lives alone in urban area.  She
uses to perform some household tasks.  She remains at home seeing
T.V.; hearing radio and reading the newspaper most of the time.
She relates with people fairly but not talking with them for
rather long time.  Her relations are cordial.  Personal habits
are good; caring of her self without aid.  She does not depend
on others.

<u>MENTAL EXAMINATION</u>

The patient is a WD, medium size, female, clean and neat, with
good personal hygiene, wearing glasses.  The attitude and behavior
of this patient while interviewing was:  Quiet, polite, spontaneous,
alert, cooperative with no gestures or mannerism, sad, somewhat
apathetic, slow, passive, speaks in medium tone of voice using
no neologisms.  Production of thoughts shows:  No retardation;
no blocking or pressure of thoughts.  Her answers were:  Relevant
and coherent.  Delusion of grandeur, self accusations, persecutions or
influence were not present, nor ideas of reference.  Worthlessness
ideations were elicited in the content of thought.  Her attention
was not easily distracted.  Auditory and visual hallucinations
were not present.  Patient has made no suicidal attempt.  She
denies suicidal or homicidal ideas at the time of the interview.
The affect was appropriate to thought content and mood.

<u>General Knowledge</u>:  In accordance with education.  The patient was
well  oriented in the three spheres.  Memory adequate  for recent
and remote events.  Judgment and insight fair.

Page 3
Ivy Meléndez Arroyo...

DIAGNOSIS:

| Axis I | : | 1. Major Depression - Mild. |
|--------|---|-----------------------------|
|        |   | 2. Bereavement. |
|        |   | 3. Adjustment Disorder, Mixed. |

Axis II    :    Obssessive Compulsive Personality.

Axis III   :    1. Irritable Bowel Syndrome.
                2. Type 2 Diabetes Mellitus.
                3. Hypertensive Cardiovascular Disease.

Axis IV    :    Unemployment - Financial difficulties -
                Sudden death of mother.

Axis V     :    GAF - 75 - present.

COMMENTS:

The patient is able to take care of her personal needs. There
is no necessity of close supervision, at the present, for her
daily activities. The patient will be benefited at present
from psychotherapy. Mrs. Meléndez has the ability to manage her
own funds. Claimant is in partial remission of symptons.

PROGNOSIS:   Good.

SUMMARY:

Mrs. Meléndez developed an adjustment disorder by February of
1997 due to some laboral difficulties. Her psychiatrist found
her more depressed in March 26, 1997 changing the diagnosis
to a Major Depressive-Episode placing her in rest for three
weeks. He again gave her a certificate to continue resting
until May 9, 1997 in spite of significant improvement as stated
in the progress notes of her medical record. She continued to
improve and by June of 1997 she began to sell commercial products
in her free hours while working in Cutler Hammer Company. She
continued doing fairly well until November 6, 1997 when her
mother had to be hospitalized in a intensive care unit.
On November 27 her mother died and the patient's condition
worsened. Bereavement lasted for the next weeks and finally
in January 20, 1998 she was referred to The State Insurance
Fund. Mrs. Meléndez never lost contact with reality and
the capacity to understand and relate with others. She has been
suffering of a mood disorder that has significantly improved
with treatment. She never developed a thought disorder, so we
can reasonably conclude that she was able to function fairly

Page 4
Ivy Meléndez Arroyo...


well in social and laboral settings during the period of
time of March of 1997 to February of 1998.

In fact, Mrs. Meléndez was willing to return to work even
when rest periods were recommended to her.


Luis Raúl Alfaro, M.D.
Psychiatrist

UPDATED D Report

w/c

**EXPERT WITNESS REPORT**    EXHIBIT E

I.    Purpose of Engagement

Mental competency of Mrs. Ivy Meléndez during the period of time from
February 14, 1997 to March 4, 1998

II.    Data and Information Considered

   A.  Ivy Meléndez medical records

      1.  Progress notes of Dr. Raúl Antonio Núñez Díaz

      2.  Other medical records

   B.  State Insurance Fund record

      1.  Medical records contained therein

   C.  Social Security Administration records

   D.  Deposition of Dr. Haydeé Costas

   E.  Pertinent portions of deposition testimony:

      1.  Ivy Meléndez

      2.  Esther Meléndez (sister of Ivy)

      3.  Ivette Pagán Meléndez (daughter of Ivy)

      4.  María Esther Pagán Meléndez (daughter of Ivy)

III.    Opinion and Basis for the Same

   A.  *February 14, 1997 to November 6, 1997*

            On February 14, 1997, Mrs. Ivy Meléndez, Accounting Manager of
Cutler-Hammer Company, was informed that she was being reassigned
to a newly created position of finance reporting.    The position was
created by Cutler-Hammer to try to accommodate Plaintiff in a position

where it was expected that she could perform better. She was given a pay raise and suffered no reduction or loss of any employment benefits. Nevertheless, Mrs. Meléndez developed an acute chest pain deciding to visit Dr. Juan A. Rodríguez in Bayamón Cardiologic Center the day after. Dr. Rodríguez diagnosed "uncontrolled high blood pressure" prescribing her a medication and giving her a sick leave certificate of six days. On March 11, 1997 Mrs. Meléndez visited for the first time Dr. Raúl Antonio Núñez Díaz, a psychiatrist who evaluated her, made a diagnosis of an adjustment disorder with mixed emotional features. On her second visit, Dr. Núñez Díaz changed the diagnosis to a major depressive episode because the patient exhibited a more intense depressive clinical picture. Dr. Núñez gave no details of the clinical findings that motivated the new diagnosis. He medicated her with an antidepressant and tranquilizer recommending complete rest for three weeks. Mrs. Meléndez continued to visit her psychiatrist and marked improvement of her emotional condition was attained. She returned to work on a regular basis. On November 6, 1997 Mrs. Meléndez called Dr. Núñez for an appointment because her mother had to be hospitalized in the intensive care unit in a critical condition. Mrs. Meléndez was found to be very anxious and with feelings of hopelessness due to the probable imminent loss of her mother. Dr. Núñez then initiated a therapy on an intellectual level emphasizing the mourning phases that she was going to undergo upon the loss of her mother. This loss, the death of a loved one, is known in psychiatry as Bereavement. In the same progress note, that of

2

November 6, 1997, Dr. Núñez wrote that problems at her work setting "+ ó - resueltos" meaning that her work difficulties were more or less resolved.

As we can see, the patient in this period of time was able to perform duties in her work setting except for some weeks that rest was recommended by her therapist. Additionally, the patient was initiated on an intellectual kind of therapy that obviously means that Mrs. Meléndez's cognitive functions were preserved; otherwise that kind of psychotherapy would have to be discontinued.

B. *From November 6, 1997 to December 11, 1997*

The next appointment of Mrs. Meléndez was on November 25, 1997 when she was found with a "marked depressive picture". Reassurance was given by Dr. Núñez who continued to explain to the patient the factors of her depression. The medication was increased ("Rx = ↑"). Dr. Núñez again gave no details of the depressive symptoms that were ongoing. Ivy's mother died on November 27 but it is not until December 11, 1997 that she was seen again by Dr. Núñez. In the progress note of that date Dr. Núñez wrote that the patient was undergoing mourning due to her mother's death. He emphasized compliance with the medication.

It should be noted that there is no indication in Dr. Núñez's notes that the patient's cognitive or intellectual functions were impaired or deteriorated.

### C. From December 11, 1997 to March 4, 1998

The next appointment was scheduled for December 30, 1997. Dr. Núñez found the patient very depressed and explored suicidal ideations: "Jesus, doctor! I will never do it", answered Ivy. Medication for both her emotional and organic conditions (diabetes and arterial hypertension) was prescribed. On January 15, 1998 insurance form papers were filled out. Patient continued to be depressed ("↓").

On January 16, Mrs. Meléndez reported to work but was told by the personnel office supervisor of Cutler-Hammer that she should report to the State Insurance Fund. On January 29 the patient visited again Dr. Núñez who found her very anxious with insomnia, anorexia, her legs trembling and with constant concern regarding her bad situation. Again there is no reference that Mrs. Meléndez's cognitive functions were impaired.

On January 16, Mrs. Meléndez visited the State Insurance Fund where she was seen by Mrs. Rosado, RN who found her oriented. On that same date, she was referred for psychological evaluation and the psychologist, Dr. Félix Alamo, found her alert, logical, coherent, relevant, well oriented, and cooperative although depressed, the reason why she is referred for psychiatric evaluation. On February 9, 1998 she was seen by the psychiatrist, Dr. Rivera, who found her well oriented, with good memory, attention and general knowledge although with diminished concentration and depressive symptoms. On that same date she was interviewed and gave a sworn statement to a State Insurance Fund

investigator, which reflects she was able to effectively communicate in a rational way.

On February 12, the State Insurance Fund social worker, Mrs. Wilma González, assigned to the case, made a psycho-social study report in which she found that Ivy was "accessible, cooperative, and with logical thinking". The 10th and 19th of February Mrs. Meléndez was seen again by Dr. Núñez finding her depressed with psychomotor retardation and anhedonia.

At the State Insurance Fund Mrs. Meléndez was referred for psychiatric treatment with Dr. José Ríos Cervantes who treated her from February 23 to July 22, 1998. Dr. Ríos Cervantes pointed out in his final psychiatric treatment report that the patient was found to be logical, coherent, relevant, pertinent in her answers, alert, with good judgment, comprehension and an ability to calculate throughout the whole treatment period. Dr. Ríos also stated that the patient has good insight and is able to handle funds.

On February 18, 1998, Mrs. Ivy Meléndez asked for social security disability benefits that were eventually granted to her due to both her physical and emotional conditions. It is pertinent here to say that in the daily activities questionnaire that had to be completed by Mrs. Meléndez, she stated that she was living alone, was not dependent on others in order to take care of herself, and that she had no major problems in her interpersonal relationships.

5

*Conclusion*

From the study of the medical documentation and other information sources, Mrs. Ivy Meléndez suffered a depressive condition. However, these also reflect that her depressive condition did not affect her cognitive functions nor her contact with reality. As has been said, Dr. Núñez's notes and other medical records, reflect that she was in good contact with reality and preserved cognitive functioning. If it was the case that Mrs. Meléndez reasoning was affected, the doctor would have written it in his progress notes. The kind of therapy in patients with a major depressive condition depends on what areas of the mental status are impaired. A major depression can develop with or without psychosis, cognitive impairment, or suicidal risk. Therefore, it is very important that these symptoms be documented. Clinically, we cannot reach conclusions of severe global deterioration or dysfunction without clear recorded data. On the other hand, it is clear from the documentation studied that Mrs. Meléndez's engaged in initiatives such as asking to continue working during the period of time in controversy, visiting the State Insurance Fund seeking benefits, and also seeking legal advice in order to deal with her work problem and its consequences. The statements of Mrs. Ivy Meléndez's sister and daughters regarding the patient's overall functioning are not compatible not only with the medical findings but also with Ivy's already mentioned behavior.

Finally, to a reasonable degree of medical certainty, it is my opinion that Mrs. Ivy Meléndez was able to understand and deal in a rational way with all the circumstances of her daily life events. Furthermore, her decision making was not impaired and did not prevent her seeking legal counsel or communicating with

6

counsel.  Therefore, she was mentally competent during the period of time of February 14, 1997 to March 4, 1998.

IV.  Exhibits that can be used to support the opinions

See Section II.  *ante*

V.  Qualifications as an expert

I can evaluate Plaintiff's alleged mental capacity as a practicing psychiatrist.  My curriculum vitae follows:

Luis Raúl Alfaro Rivera, MD
RR 2 Box 1354
Camino El Capá, Cupey Bajo
Río Piedras, Puerto Rico  00927
Tel. 755-0328, 751-8209

Education:

| | |
|---|---|
| 1959 | Bachelor of Natural Sciences<br>University of Puerto Rico<br>Río Piedras, Puerto Rico |
| 1969 | Doctor of Medicine<br>School of Medicine<br>University of Barcelona, Spain |
| 1970 – 1971 | Internship in Medicine and Surgery<br>Auxilio Mutuo Hospital<br>Río Piedras, Puerto Rico |
| 1971 – 1974 | Residence in Psychiatry<br>Veterans Administration Hospital<br>Río Piedras, Puerto Rico |

Experience:

| | |
|---|---|
| 1974 – 1976 | Member, Psychiatric Staff<br>Veterans Administration Hospital<br>Río Piedras, Puerto Rico |
| 1978 – 1983 | Consultant in Psychiatry and Treatment<br>Physician for the Mental Health Program<br>Humacao, Puerto Rico |

7

| 1980 – 1983 | Director of Psychiatric Services<br>Nuestra Señora de los Angeles Hospital<br>Río Piedras, Puerto Rico |
|---|---|
| 1986 – 1989 | Member of the Staff, Psychiatric Services<br>Veterans Administration Hospital<br>Río Piedras, Puerto Rico |
| 1987 – 1989 | Psychiatrist, Addiction Department<br>Veterans Administration Hospital<br>Río Piedras, Puerto Rico |
| 1976 – Present | Private Practice<br>Midtown Building<br>Río Piedras, Puerto Rico |
| 1992 – 1993 | Assistant Director of Psychiatric<br>Emergency Area, San Patricio<br>Mental Health Center |
| 1993 – 1996 | Executive Director and Psychiatric<br>Trujillo Alto Psychosocial Center (ASSMCA) |

## Additional Experience

Twenty- five years experience as Psychiatric Consultant for federal and local government agencies such as Social Security Disability Determination Program, ACAA, Vocational Rehabilitation Program, State Insurance Fund, Puerto Rico Industrial Commission, the Government Retirement System and others.  Ample experience in the treatment of addicts both in private practice and in clinical areas.  Vast experience as psychiatric expert in legal cases both in the federal and local Courts and the Puerto Rico Industrial Commission.  In the latter I have evaluated approximately 11,500 cases participating as an expert medical witness.

VI.  List of all cases in which the expert testified at trial or by deposition in the last four years:

I have acted as a consultant or expert in numerous cases.  I have been deposed and / or testified in the cases that appear below.  I cannot list all of the cases in which I rendered services before September 21, 1998 because of the damages caused to my files due to Hurricane Georges, although I have

8

been able to reconstruct the name or title of some of them. After Hurricane

Georges, I have acted as consultant or expert in the following cases:

1. *Daniel Mojica Flores*, Civil No. HAC 98-0158, regarding unjustified termination, age discrimination, and physically impaired discrimination. Plaintiff Daniel Mojica Flores was evaluated on January 10 and 18, 2002. The hearing in this case is pending. My contract is with the law firm of Mondríguez & Mondríguez.

2. *Jorge López Reyes v. Cutler Hammer*, Civil No. EPE 1998-0309. Plaintiff was evaluated on February 17, 2000. The hearing in this case will be held at Caguas Superior Court on August 21, 2001. My contract is with the law firm of Del Toro & Santana. I have testified at deposition in this case.

3. *Miriam Rivera v. Cutler Hammer*, Civil No. EAC-96-0300 (612), regarding unjustified dismissal and damages. Plaintiff was evaluated regarding discrimination by sex and pregnancy. Plaintiff was evaluated on May 10, 2001. My contract is with the law firm of Del Toro & Santana. I have testified at deposition in this case.

4. *Janelle Bonilla Ortiz v. Cutler Hammer*, Civil No. BAC 99-0215, regarding discrimination by sex and pregnancy. Plaintiff was evaluated on May 10, 2001. My contract is with the law firm of Del Toro & Santana. I have testified at deposition in this case.

5. *Fernando Colón Cartagena v. Cutler Hammer*, JPE-1999-0174. Plaintiff was evaluated on March 1, 2001. My contract is with the law firm of Del Toro & Santana. I have testified at deposition in this case.

6. *Gloria Pagán v. Cutler Hammer*, Civil No. 00-1298 (SEC). Plaintiff has not been evaluated. The hearing in this case is pending. My contract is with the law firm of Del Toro & Santana. I have testified at deposition in this case.

7. *Jaime Medina v. Eaton Corp., et al.*, Civil No. CD-94-2341, at the Caguas Superior Court. My contract was with the law firm of Del Toro & Santana. I have testified at deposition and trial in this case.

VII. Overview of Practice

I am a practicing physician who dedicates approximately fifty (50)

percent of my professional time to an active practice and the balance to

9

providing expert services under contract with the Puerto Rico Industrial Commission since 1976 to present.

If the plaintiff is interested, there is an illustrative list of the volume of cases seen by Dr. Alfaro at the Puerto Rico Industrial Commission for the past 13 months. These cases are 75% psychiatric evaluations that are seen through public hearings.

Luis Raúl Alfaro Rivera, MD
Psychiatrist License Number 3866

10